**BRINE, INC., Plaintiff,**

v.

**STX, L.L.C., Defendant.**

**Civ.A. No. 99–40167–NMG.**

United States District Court,
D. Massachusetts.

March 31, 2005.

John S. Artz, Artz & Artz, Southfield, MI, for Warrior Lacrosse, Inc., Defendant.

John T. Bennett, Palmer & Dodge, LLP, Boston, MA, for STX, Inc., Defendant.

Daniel Gordon Cromack, Palmer & Dodge, LLP, Boston, MA, for STX, Inc., Defendant.

Brian M. Dingman, Mirick, O'Connell, DeMallie & Lougee, LLP, Westborough, MA, for Brine, Inc., Sports Licensing, Inc., Counter Defendant.

Douglas C. Doskocil, Goodwin Procter LLP, Boston, MA, for STX, Inc., Counter Claimant.

Lucy Fowler, Foley Hoag LLP, Boston, MA, for Sports Licensing, Inc., Plaintiff.

Jenifer E. Haeckl, Mirick & O'Connell, Westborough, MA, for Brine, Inc., Counter Defendant.

Eileen M. Herlihy, Palmer & Dodge, LLP, Boston, MA, for STX, Inc., Counter Claimant.

Erin D.E. Jofre, Palmer & Dodge, LLP, Boston, MA, for STX, Inc., Defendant.

Ralph A. Loren, Palmer & Dodge, LLP, Boston, MA, for STX, LLC, Defendant.

Peter D. McDermott, Banner & Witcoff, LTD, Boston, MA, for Warrior Lacrosse, Inc., Defendant.

John O. Mirick, Mirick, O'Connell, DeMallie & Lougee, Worcester, for Brine, Inc., Plaintiff.

Kenneth W. Salinger, Palmer & Dodge, LLP, Boston, MA, for STX, Inc., Defendant.

Lindsey M. Straus, Law Office of Lindsey M. Straus, Brewster, for Brine, Inc., Sports Licensing, Inc., Plaintiffs.

Philip C. Swain, Foley Hoag LLP, Boston, MA, for Sports Licensing, Inc., Plaintiff.

## MEMORANDUM & ORDER

GORTON, District Judge.

In the instant dispute, Brine, Inc. ("Brine") asserts that STX, L.L.C. ("STX") violated a permanent injunction entered by this Court following a jury verdict in Brine's favor. Brine alleges that STX continues to infringe Brine's patent on a lacrosse stick design. Presently before the Court is Brine's "Verified Complaint for Contempt" (Docket No. 312) through which Brine seeks to recover damages arising from the alleged continuing violation.

## I. *Factual Background*

Brine and STX are market competitors engaged in the design and manufacture of lacrosse sticks. On September 29, 1999, Brine filed suit against STX, alleging that the "Octane", "Proton" and "X2" lacrosse sticks sold by STX infringed U.S. Patent No. 5,651,549 and U.S. Patent No. 5,935,-026 ("the '026 Patent"). The case was tried to a jury and, on November 17, 2003, its verdict found that STX had infringed the '026 Patent.

Specifically, the jury found that STX had infringed Claim Six of the '026 Patent, which claims a lacrosse head with the following design:

> at least a section of said upper rims of said sidewalls, within the portion of said sidewalls which defines the rearward throat section, is at or below said centerline and substantially remains at or below said centerline forwardly of said rearward throat section to said forward nose.

The "centerline" is an imaginary line drawn through the center of the shaft (or handle) and extending toward the head. The "rearward throat section" is the part of the lacrosse head that is closest to the shaft (and farthest from the nose).

On February 17, 2004, this Court entered a permanent injunction in which it stated that "STX shall not make, offer to sell or sell within the United States the products currently sold under the commercial names of Octane, Proton or X2". The Court also required that all previously manufactured lacrosse heads bearing those names be placed in bonded storage pending the outcome of any appeal. On March 3, 2004, STX submitted an affidavit verifying that it had complied with the injunction.

On October 22, 2004, Brine filed a "Verified Complaint for Contempt" in which it alleges that STX has violated the injunction by continuing to sell a product that is "substantially the same" as the X2 but which is named "X2+".[1] Brine alleges that STX marketed the X2+ on its website and in its catalog after the injunction was entered. In March, 2004 and September, 2004, Brine purchased X2+s ("the March X2+" and "the September X2+", respectively) and had them professionally measured by Stephen Derosier, the same individual who had made measurements of the X2 for trial. Copies of the new measurements were filed with the verified complaint and suggest a close degree of similarity between the X2 and the X2+.

STX responded by filing a motion to dismiss in which it argues that contempt proceedings are inappropriate (in lieu of a new trial) because the X2+ is "significantly different" from the X2. STX offered the declaration of Dale Kohler ("Kohler"), Executive Vice President of STX, who stated that the X2+ had a redesigned "throat area" (i.e. the area where the shaft connects to the head) which resulted in a "significant change in the relationship between the upper rims of the sidewalls and the centerline of the stick". STX also filed design drawings of the X2+ which purported to show the change and offered testimony that, prior to manufacturing the X2+, it had obtained the opinion of Shaw Pittman LLP, outside patent counsel, that the X2+ did not infringe the '026 Patent.

On November 12, 2004, the Court convened a status conference and instructed the parties to submit memoranda addressing the alleged similarity of the products and the appropriateness of a contempt proceeding to resolving the dispute. The Court also visually observed and compared the X2 and the X2+.

---

**1.** Brine's "Verified Complaint for Contempt" will be treated as a motion for contempt.

On November 29, 2004, Brine filed its memorandum. It contends that there are no substantial differences between the X2 and the X2+. To illustrate its argument, Brine compares X2 measurements used at trial with those of the March X2+ and the September X2+. The comparisons suggest that the differences between the heights of the sidewalls and the centerlines of the X2 and the X2+s are on the magnitude of a few thousandths of an inch. Moreover, the measurements indicate that the first few lateral inches of the X2+s' sidewalls, in the crucial "rearward throat area", are actually closer to the centerline than those of the X2.

Brine also offers the Affidavit of Alfred Beland ("Beland"), President of AJEC Engineering, Inc. Brine had hired Beland to measure the X2 used at trial, as well as the two X2+s it bought. Beland generated a series of "contour maps" showing the heights of the sidewalls of the sticks in relation to their respective centerlines. The drawings reveal a striking similarity between the profiles of the X2 and the X2+.

STX filed its response on December 20, 2004, claiming that the X2+ was designed not to infringe the '026 Patent. To that end, the "throat area" of the X2+ is allegedly "pinched" by two degrees (2) such that the head and the shaft are bent closer to parallel, i.e. the angle between them is "less obtuse". The alleged effect of that modification is to elevate the tops of the sidewalls of the X2+ so that they are "substantially" above the centerline. STX offers the affidavit of Harold Capshaw ("Capshaw"), Vice President and General Manager of Innovative Plastic Solutions, Inc. ("IPS"), the company that manufactures the X2+, in which he states that the X2+ is manufactured using a new, two-step process not used to manufacture the X2. The process is described in more detail below.

On February 22, 2005, this Court entered an Order which directed that the dispute would be resolved by a brief evidentiary hearing focused upon:

> the degree of similarity between the X2 and the X2+ lacrosse sticks, the accuracy of Brine's measurements of the X2+ and the effect (if any) of the differences in the manufacturing processes of the X2 and the X2+.

The Order provided that each party would be afforded 60 minutes to present its argument and would be permitted to call one witness or expert witness.

The hearing was convened on March 21, 2005. Brine called Mr. Beland as its witness and he testified about the method he used to measure the three lacrosse sticks in question. He measured the heights of their sidewalls using a "Brown and Sharp Validator" ("the Validator") which allegedly is accurate to within one ten-thousandth (.0001) of an inch, or one-thirtieth (1/30) the width of a sheet of paper. To correct for potential variations among the lacrosse stick shafts, he used the same shaft to measure all three heads, affixing it to each one with a screw as provided by the manufacturer.

Mr. Beland testified that he ensured that the shaft was perfectly horizontal (which is crucial to an accurate determination of the centerline) by placing it on a granite block and holding it in place with a clamp. He explained that he then calculated the location of the centerline by determining the center point of the shaft and extrapolating a line lengthwise through the shaft and out through the head. Based upon his measurements, Beland generated "contour maps" and testified that the X2 and the X2+s were "identical" within the accuracy possible when working with plastics.

STX cross-examined Beland briefly, eliciting testimony that, in general, the two-

step manufacturing process utilized by STX is a legitimate method of working with plastics. Mr. Beland also testified that, when taking his measurements, the lacrosse sticks were held in place by blocks.

STX called Mr. Kohler as a witness and he testified that the X2+ was designed not to infringe the X2. He explained that the same molding process that had been used to make the X2 head was used to make the X2+ head, resulting in the two heads having identical contours. The difference, he testified, was introduced during the second step of the manufacturing process ("step two") when the head was heated and put into a tool to bend it by two degrees (2).

As demonstrated by Mr. Kohler and counsel, visually, the result of step two, if successful, would be that the angle between the shaft and the head would become "less obtuse", with the throat area being the pivot point. Kohler testified that IPS randomly verified that the desired two-degree change had been accomplished on the manufactured X2+ lacrosse sticks. Moreover, he stated that STX randomly and visually rechecked X2+s to ensure that the desired angle had been generated. The visual checking was aided by the use of a laser which was projected parallel to the shaft, allegedly allowing STX to verify that the sidewall heights were above the centerline and thus non-infringing.

Brine cross-examined Mr. Kohler about "mold memory", which is the physical property of nylon, once bent, to return to its original shape. Kohler testified that the X2+ head was made of Dupont "801" nylon, which the Dupont catalog states should be molded at 504 degrees, Fahrenheit. When asked, Mr. Kohler could not

recall the temperature at which the nylon was bent during step two.[2]

During closing arguments, Brine emphasized the fact that STX had offered no numerical measurements of its own. STX, on the other hand, argued that Brine's recovery should be barred because it waited several months after deriving the March, 2004 measurements before filing the present complaint. STX also intimated that the entire summary proceeding, including the hearing itself, was inappropriate because STX had not had an opportunity to depose Brine's experts. The Court took the matter under advisement and the hearing was adjourned.

## II. *Legal Analysis*

### A. Contempt Proceedings in Patent Infringement Cases

 Pursuant to 18 U.S.C. § 401, courts are empowered to "punish" disobedience of their orders through contempt proceedings. Alleged violations of permanent injunctions issued pursuant to Fed. R.Civ.P. 65 may be addressed through such proceedings. *KSM Fastening Systems, Inc. v. H.A. Jones Company, Inc.*, 776 F.2d 1522, 1526 (Fed.Cir.1985). Contempt will be found, however, only if the violation is clear because only then is the court's authority in need of vindication. *Id.* In patent infringement suits, where a party has been enjoined from further infringement and a violation of that order is alleged, the court makes a two-part inquiry to determine whether the enjoined party should be held in contempt. *Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1349 (Fed. Cir.1998); *KSM Fastening Systems*, 776 F.2d at 1532.

**2.** According to the affidavit of Harold Capshaw, step two is performed "while at a temp- erature over 200".

First, the court determines whether a contempt proceeding is an appropriate forum in which to adjudicate the alleged infringement by comparing the enjoined device to the modified device. *Additive Controls & Measurement Systems,* 154 F.3d at 1349. If the devices are more than "colorably" different from one another, contempt proceedings are inappropriate. *KSM Fastening Systems,* 776 F.2d at 1530. The Federal Circuit has elaborated upon that test by stating that:

> a party may seek relief by way of contempt proceedings only if the issues are appropriate for summary disposition. If substantial issues need to be litigated, particularly if expert and other testimony subject to cross-examination would be helpful or necessary, the court may properly require a supplemental or new complaint. The question to be answered ... is essentially a *procedural* one. Must substantial new issues be litigated to determine infringement?

*Id.* at 1531 (emphasis in original).

Second, if a contempt proceeding is deemed appropriate, the court then considers the issue of contempt. *See KSM Fastening Systems,* 776 F.2d at 1532. To support a finding of contempt, "the patent owner must prove by clear and convincing evidence that the modified device falls within the admitted or adjudicated scope of the claims and is, therefore, an infringement." *Arbek Manufacturing,* 55 F.3d at 1569 (citation omitted); *KSM Fastening Systems,* 776 F.2d at 1528. A finding that the modified device is an infringement is the *sine qua non* of contempt. *KSM Fastening Systems,* 776 F.2d at 1528–29.

█ Although the Court must look to the patent itself to determine whether the modified product infringes, previous findings of infringement can elucidate the scope of the subject claim(s). *Id.* at 1529. The Federal Circuit has stated that:

> [i]t may, in some cases, only be necessary to determine that the modified device has not been changed from the adjudged device in a way which affects an element of a claim. In such case the new device, though modified, may be treated the same as the device which was admitted or adjudged to infringe.

*Id.* That rule exists because contempt is predicated upon a finding that the modified device falls within the "*adjudicated scope of the claims*". *Arbek Manufacturing,* 55 F.3d at 1569 (emphasis added). If both prongs are proven by clear and convincing evidence, sanctions for contempt are appropriate.

## B. Prong One: Appropriateness of Summary Proceedings

█ From the onset, it has been abundantly clear that the present dispute is appropriate for disposition by summary proceedings. STX admits that the X2+ head is molded in exactly the same way as the X2 head, resulting in heads with identical contours. The only potential difference between the X2 and the X2+ is the two-degree (2 ) "pinch" which is allegedly introduced during step two. Thus, the only issue before this Court is whether that two-degree (2 ) change is present in manufactured X2+ lacrosse sticks.

There are no outstanding legal issues concerning infringement because, if the two-degree (2 ) change is not manifested in the X2+s, then there is no difference between it and the X2 and there is, *a fortiori,* infringement. Likewise, the Court assumes (but need not conclude) that if the change is present, a new trial would be necessary to address the question of infringement. The dispute could scarcely be more simple: Does step two of the manufacturing process result in any meaningful change in the X2+?

Brine has offered compelling evidence that the question should be answered in the negative and that the X2+ is, at most, a "colorable" variation of the X2. Visually, the Court found the X2 to be indistinguishable from the X2+. The two products are also indistinguishable in photographs offered by Brine. The measurements and contour maps offered by Brine's experts strongly suggest that the X2+ differs from the X2, if at all, by a few hundredths of an inch. Accordingly, there are no "substantial new issues" to be litigated and the dispute is appropriate for resolution by summary proceedings.[3]

## C. Prong Two: Infringement by the X2+

■ Having determined that the dispute is appropriate for summary disposition, the critical question becomes whether the X2+ infringes the '026 Patent. *See Arbek Manufacturing,* 55 F.3d at 1569. Claim Six of the Patent refers to a lacrosse head:

wherein at least a section of said upper rims of said sidewalls, within the portion of said sidewalls which defines the rearward throat section, is at or below said centerline and substantially remains at or below said centerline forwardly of said rearward throat section to said forward nose.

A finding of contempt is contingent upon whether the X2+ contains those elements and, thus, infringes. *See KSM Fastening Systems,* 776 F.2d at 1528–29.

■ Under *KSM Fastening Systems,* a finding of infringement may be predicated upon a conclusion that "the modified device has not been changed from the adjudged device in a way which affects an element of a claim". *Id.* Such is the case here because the evidence shows that the X2+ ("the modified device") is not meaningfully different from the X2 ("the adjudged device"). There are several reasons why that is so.

### 1. Brine's Measurements

Measurements taken by Derosier of the March X2+ and the September X2+ are potent. Those measurements disclose that the heights of the X2+ sidewalls differ from those of the X2 by only a few hundredths of an inch at most locations on the head. Such insignificant differences are consistent with the observation that the sticks are visually indistinguishable.

The largest difference in sidewall height between the X2 and the X2+ occurs in the "rearward throat area", i.e. near to where the shaft attaches to the head. In that area, the X2 sidewall heights differ from those of the X2+ by almost one half-inch. Surprisingly, however, the half-inch difference is not in STX's favor because the sidewalls of the X2+ are actually *lower* in that section than those of the X2. In other words, the top edges of the sidewalls of the X2+ in the "rearward throat area" are *closer* to the centerline than those of the X2.

The jury verdict of infringement of the '026 Patent necessarily implies that the heights of the sidewalls of the X2 were "low" enough to infringe the subject patent claim in the rearward throat area. Because the measurements of the X2+ in the same area indicate sidewalls which are even lower, the element of Claim Six which refers to the "rearward throat area" is present in the X2+ stick. Thus, Derosier's measurements indicate that the varia-

---

**3.** The fact that the Court convened a two-hour evidentiary hearing involving expert testimony does not, itself, indicate that "substantial new issues" are presented by the dispute. *See Additive Controls & Measurement Systems,* 154 F.3d at 1349–50 (affirming use of summary contempt proceeding by a district court where court had held a three-day evidentiary hearing involving expert testimony).

tions between the X2 and X2+ are imperceptible and, in any event, are not of a nature which would affect any element of Claim Six.

## 2. Beland's Testimony

The accuracy of Derosier's measurements is buttressed by the testimony and measurements of Mr. Beland, who is an expert in plastics manufacture and "reverse engineering". Beland testified to the technique he used to measure the three lacrosse sticks at issue using the Validator. From his measurements, he generated contour maps which show that the sidewalls of the X2+ are virtually identical in their relationship to the centerline as those of the X2. Indeed, when the three contour maps (one for each stick) are superimposed upon one another, for all intents and purposes, a single line is formed. If a two-degree (2) change had been implemented in the X2+, its contour should reflect a relationship to the centerline significantly different from what it shows in Beland's measurements.

In addition, Beland testified that there is an inherent imprecision in products manufactured using nylon because there is a "shrinkage" factor associated with the material. Beland confirmed that the X2 and the X2+s that he measured were identical within the precision possible with respect to such material.

STX sought to impeach Beland's measurement technique by suggesting that he had somehow forced the X2+ into place in the Validator, under pressure, such that it would necessarily have the same dimensions as the X2. That contention is implausible for two reasons.

First, Brine offered photographs of the lacrosse sticks situated in the Validator for measurement and there is no apparatus of any kind pushing downward on the lacrosse stick. If anything, there appear to be wedges situated *under* the head which could only push it forward or upward (i.e. tend to make the sidewalls higher).

Second, STX's contention that Beland's methodology contorted his measurements defies common sense. STX suggests that the X2+ sticks were "bent" into the shape of the X2 when they were placed in the Validator. Such contortions, however, would have put pressure on the stick and, like a catapult, would have caused either the shaft or the head to be strung upward. The Court concludes that Mr. Beland used an appropriate measuring technique, did not overlook such a simple and readily-apparent problem and performed his measurements correctly.

## 3. Lack of Measurements by STX

STX, for all of its criticism Brine's measurements, has declined to offer any of its own. That omission is puzzling in light of the fact that STX, as manufacturer of the X2+, could have easily taken such measurements. Indeed, Brine offered to STX the three lacrosse sticks that it measured but STX declined to have them measured independently.

At the hearing, counsel for STX asserted that STX did take measurements of X2+s. The Capshaw Affidavit states that the manufactured sticks were measured by IPS using an "optical comparator". Mr. Kohler also testified that the sticks are sometimes visually rechecked by STX using a laser. STX has not, however, offered any objective evidence (i.e. numerical figures) relating to those measurements.[4] As

---

4. Nine days after the hearing, STX filed a series of photographs which allegedly show an X2+ with a laser beam projected along its length. Brine has moved to strike the photographs but the Court declines to do so because the submission does not alter the Court's decision in any event. The pictorial representation of the laser beam is inconclusive and the photographs depict only an X2+ and provide no basis for comparison to an X2.

a result, the Court is left with no reason, or basis upon which, to doubt the accuracy of Brine's evidence.

#### 4. Testimony of Kohler

Mr. Kohler's testimony was largely focused upon the design of the X2+. He stated that the X2+ was designed to have a two degree (2˚) "pinch", the effect of which was to elevate the top edges of the sidewalls to "substantially above" the centerline. He relied upon IPS to ensure that the change was actually manifested in the new sticks and upon the opinion of counsel that the design would not infringe Brine's '026 Patent.

Neither aspect of Kohler's testimony is persuasive because testimony relating to the design, rather than to the finished product, is of limited relevance. The injunction entered by this Court stated that STX "shall not *make* ... the products currently sold under the commercial names of Octane, Proton or X2" (emphasis supplied).

The outside legal opinion is unavailing for much the same reason. Mr. Kohler testified that the opinion was obtained before the manufacturing process began and that it related to the design of the X2+. The issue is not one of design, it is of manufacture.

On the question of manufacture, Brine explored, on cross-examination, the concept of "mold memory" which could explain the apparent disconnect between STX's alleged design and the final product. The evidence shows that the Dupont catalog recommends that the kind of nylon in question should be molded at 504 degrees Fahrenheit. STX has presented evidence only that it performed step two of the manufacturing process at "a temperature over 200" (presumably Fahrenheit). Thus, it is very possible that mold memory may explain why the X2 and the X2+ are indistinguishable.

In any event, the Court concludes that, based upon all of the evidence presented, the manufactured X2+ lacrosse sticks are not different from the X2 lacrosse sticks in any way which affects Claim Six. As such, Brine has proven infringement by clear and convincing evidence. STX will be held in contempt and an appropriate sanction will be imposed.[5]

### D. Sanction

 This Court "has great discretion when deciding how to enforce violations of its own orders". *Eagle Comtronics, Inc. v. Arrow Communication Laboratories, Inc.,* 305 F.3d 1303, 1314 (Fed.Cir.2002). *See Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 428, 43 S.Ct. 458, 67 L.Ed. 719 (1923)("[t]he degree of punishment for contempt ... is in the discretion of the court whose dignity has been offended and whose process has been obstructed"). The primary purpose of a sanction for civil contempt is to compensate the aggrieved party but it may also have a "punitive aspect". *Goya Foods, Inc. v. Wallack Management Co.,* 344 F.3d 16, 20 (1st Cir.2003). When considering the remedial aspect, the sanction "must bear a reasonable relationship to the actual losses sustained by the injured party". *Id.*

 Brine seeks to be recompensed by an award of STX's gross revenues from sales of the X2+ and its costs and attorneys' fees incurred in bringing the complaint for contempt. Brine's entitlement

---

**5.** At the hearing, STX argued that Brine's recovery is barred by laches. That argument is rejected because 1) this is a contempt proceeding (not an infringement proceeding) in which the focus is upon vindicating the authority of the Court, and 2) Brine filed its complaint for contempt approximately six months after discovery of the continuing infringement, not an excessive amount of time and certainly not laches in this case.

to the latter is clear. It has already conducted years of litigation in order to prove that STX was infringing its '026 Patent. An injunction was entered and the matter should have been closed. Brine will be put to no further expense as a result of such continuing infringement. STX will pay Brine's reasonable costs and attorneys' fees.

Brine's other request requires further consideration. If this were merely a case of patent infringement, Brine would be entitled to:

damages adequate to compensate for the infringement but in no event less that a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

37 U.S.C. § 284. As such, § 284 provides a reasonable starting point for consideration of an appropriate sanction because Brine deserves to be fully compensated.

Given that this is a case of contempt, however, a substantial sanction is appropriate. The instant proceeding marks the second time that this Court has ordered STX to cease infringing the '026 Patent. Apparently, the award of a fair royalty, or net profits, will not deter further infringement. If, for example, Brine is awarded only STX's net profit, STX will be no worse off for having continued to infringe.

A sanction approximating STX's gross profit from sales of the X2+ is appropriate for two reasons.[6]

1. As is recognized in other areas of the law, there are evidentiary difficulties inherent in calculating net profit (i.e. profit after all expenses, depreciation and tax). *See, e.g.,* 17 U.S.C. § 504(b) (putting burden upon defendant to prove deductions from gross revenue in copyright infringe-

ment context). Given such uncertainty, there is increased risk that the plaintiff will not be made whole. In a contempt proceeding, the need to ensure that the plaintiff is fully compensated and that the defendant is deterred, is acute.

2. While an award of gross profit may overcompensate Brine, it will do so in an amount which bears a direct relationship to the degree of infringement: the more X2+s that were sold, the greater the award. As such, a sanction in the amount of gross profit from the sales of the X2+ provides a natural means of imposing a penalty that is proportionate to the severity of the contempt.

## ORDER

In accordance with the foregoing, plaintiff's Motion to Strike (Docket No. 330) is **DENIED** and plaintiff's "Verified Complaint for Contempt" (Docket No. 312), which the Court treats as a Motion for Contempt, is **ALLOWED**.

STX will file with this Court, within 30 days of the date of this Order, a statement of its gross profit from all sales of the X2+ lacrosse sticks and heads with an explanation of how the figure was calculated. Brine may file any objections to that statement within 15 days thereafter.

If STX is unable, for good cause, to comply with this instruction, it will so notify the Court in writing within the 30–day period and the Court will consider any reasonable request to amend it.

Brine will file a statement of its reasonable costs and attorneys' fees incurred in connection with the present contempt pro-

---

**6.** The term "gross profit from sales of the X2+" is intended to mean the "total sales revenue less the [manufacturing] cost of the goods sold, no adjustment being made for [any] additional expenses and taxes." *Black's Law Dictionary* (8th ed.2004).

ceedings within 30 days of the date of this Order.

So ordered.